**FILED**

OCT 1 5 2018

Clerk, U.S. District Court
District Of Montana
Missoula



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, and ALLIANCE FOR THE WILD ROCKIES, | CV 12–27–M–DLC |
| Plaintiffs, | ORDER |
| vs. |  |
| FAYE KRUEGER, Regional Forester of Region One of the United States Forest Service, UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, and UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the United States Department of Interior, |  |
| Defendants. |  |

Before the Court is Federal Defendants' Motion to Alter Judgment and

Dissolve Injunction (Doc. 55). On May 24, 2013, this Court enjoined the Fleecer

Mountains Project ("the Project") until the Forest Service and Fish and Wildlife

Service ("FWS") corrected certain deficiencies under the National Environmental

Policy Act ("NEPA") and the Endangered Species Act ("ESA") identified in this

Court's remand order. (Doc. 27.)

-1-

There, Plaintiffs claimed that the Project and the Beaverhead-Deerlodge National Forest Plan ("Forest Plan") violated various environmental laws because the Forest Service failed to complete consultation with the FWS regarding the potential effects of the "Project and Plan on grizzly bears and Canada lynx." *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1066 (D. Mont. 2013). In addition, Plaintiffs argued that the Forest Plan and Project failed to disclose and apply the best available science in its decision to exclude temporary, permitted, and administrative roads from road density calculations and failed to discuss the impact of temporary roads on elk. *Id.* This Court agreed, and enjoined the Project until the Forest Service and FWS corrected the deficiencies pertaining to lynx, grizzly bears, roads, and elk. *Id.* at 1067.

For the reasons explained, the Court denies the motion to dissolve the injunction. The Court will address each issue below.

## LEGAL STANDARD

This Court "retains the power to modify the terms of its injunction in the event that changed circumstances require it." *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir. 1985) (citations omitted). A court may "relieve a party or its legal representative from a final judgment, order, or proceeding [if] the judgment has been satisfied, released or discharged." Fed. R. Civ. P. 60 (b)(5). A party seeking a dissolution of an injunction may demonstrate that the change is

warranted by showing "a significant change either in factual conditions or in law." *Alliance for the Wild Rockies v. Weldon*, 2011 WL 3348000, at *2 (D. Mont. Aug. 3, 2011) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). A significant change in facts occurs when a party demonstrates its compliance with a court's remand order. *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

## DISCUSSION

### I. Lynx

In its remand order, the Court instructed the agencies "to consider whether lynx 'may be present' in the Forest" and to "complete any consultation that might become *necessary*" as a result of that determination. *Native Ecosystems Council*, 946 F. Supp. 2d at 1067 (emphasis added). The FWS subsequently determined that lynx "may be present" across the Beaverhead-Deerlodge National Forest. (Doc. 56-7 at 1.) This caused the Forest Service to develop and issue a biological assessment in which the agency concluded that the Project "may affect, but is not likely to adversely affect" lynx. (Doc. 56-8 at 1, 3–4.) The FWS concurred. (*Id.*)

Federal Defendants now argue that the Court should lift the injunction because the agencies have complied with the Court's remand instructions. (Doc. 56 at 6.) Plaintiffs disagree, and argue that the site-specific biological assessment

is insufficient because it does not examine the effects that the Forest Plan may have on lynx. (Doc. 63 at 28.) Plaintiffs argue that forest-wide consultation became necessary when the FWS determined that lynx "may be present" across the entire Beaverhead-Deerlodge National Forest. (*Id.* at 29.) In light of this unfulfilled requirement, Plaintiffs assert that the Project must remain enjoined until Federal Defendants fully comply with the Court's order. (*Id.* at 30.) In response, Federal Defendants assert that this Court never ordered a programmatic consult and that such consult never became "necessary." (Doc. 65 at 13.) Federal Defendants further argue that even if the Court determines that forest-wide consultation was and is required, the Court could still allow the Project to go forward. (*Id.* at 14.)

Federal Defendants final argument misconstrues the standard of review. The narrow question before the Court is whether Federal Defendants fully complied with the remand order. For reasons more fully explained, the Court concludes that it did not.

From the beginning, Plaintiffs asserted both a site-specific and programmatic challenge concerning lynx. *See Native Ecosystems Council*, 946 F. Supp. 2d at 1066 ("Plaintiffs claim that the Project and the Forest Plan violate Section 7 of the Endangered Species Act"). Neither party disputes that the Forest Service and FWS discharged their obligations concerning the Project. (Docs. 56

at 9; 63 at 29.)    The issue is whether the FWS's determination that lynx "may be present" on the Beaverhead-Deerlodge National Forest rendered forest-wide consult *necessary*.    To determine what is necessary, the Court turns to the ESA and its implementing regulations.

"The ESA requires the Secretary of the Interior to promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'"    *Bennett v. Spear*, 520 U.S. 154, 157–58 (1997) (citing to 16 U.S.C. § 1533).    The ESA also requires each federal agency to ensure that an agency action is not likely to jeopardize the continued existence of a threatened or endangered species.    16 U.S.C. § 1536(a)(2).    An "action" is "all activities or programs of any kind authorized, funded, or carried out . . . by Federal agencies."    50 C.F.R. § 402.02.    Forest plans constitute ongoing agency action.    *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994); *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 293 (9th Cir. 1992); *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 986 (D. Mont. 2013) *aff'd in part, rev'd in part sub. nom. Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) (stating that "*Pacific Rivers* remains good law in this Circuit" and holding that a programmatic plan is subject to section 7 consultation in certain circumstances).

The Forest Service's first step in complying with section 7 is to obtain from

the FWS "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)-(d) (*emphasis added*). If the FWS advises that a listed species or critical habitat "may be present," the Forest Service must complete a biological assessment to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). If the Forest Service determines that an action "may affect" a listed species, the Forest Service must consult with the FWS under section 7 of the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). Consultation may be formal or informal. 50 C.F.R. § 402.14; *Karuk Tribe of Cal.*, 681 F.3d at 1027. Formal consultation is obligatory where the Forest Service has determined that an action is "likely to adversely affect a listed species." 50 C.F.R. § 402.14 (a)-(b). But where the Forest Service determines that an action "may affect . . . [but is] not likely to . . . adversely affect[]" a listed species, the Forest Service may initiate informal consultation. 50 C.F.R. §§ 402.14(a), 402.12(a). If the FWS concurs with the Forest Service's determination that a listed species "is not likely to be adversely affected," both agencies have fulfilled their respective obligations and the federal action may proceed. 50 C.F.R. § 402.13(a).

As indicated by *Pacific Rivers Council* and *Lane County Audubon Society*, the Beaverhead-Deerlodge National Forest Plan is an ongoing agency action that falls within the purview of the ESA, therefore requiring consultation with the FWS to determine whether any listed species may be present within the forest.    In response to this Court's remand order, the FWS issued a new species list for the entire Beaverhead-Deerlodge National Forest, and determined that Lynx "may be present" on the forest as secondary or peripheral lynx habitat.    (Doc. 56-7 at 1.) The FWS placed no geographic limitation on where lynx "may be present" as it did with bull trout (which "may be present" in the Clark Fork, Flathead, Kootenai, St. Mary, and Bell river basins, including cold water rivers and lakes) and wolverines (which "may be present" in high elevation alpine and boreal forests that are cold and receive enough winter precipitation to reliably maintain deep persistent snow late into the warm season).    (*Id.*)    For this reason, the logical conclusion is that the FWS's determination indicates that lynx "may be present" across the entire forest.

This was new information.    Whereas the agencies had previously measured the potential effects of the Forest Plan on grizzly bears, bull trout, and wolves, the same was not done for lynx.    (Doc. 63 at 28.)    Therefore, unless there is some other reason why a biological assessment or biological opinion was not required to determine whether the Forest Plan "may affect" lynx, Federal Defendants have not

-7-

fulfilled their obligation under the Court's remand order.

At a hearing on this motion, Federal Defendants argued for the first time that programmatic consultation for lynx was not required because the FWS recently issued a biological opinion and determined that the Lynx Amendment is not likely to adversely affect lynx. The Lynx Amendment sets programmatic direction to protect lynx from certain actions that are likely to adversely impact lynx habitat. *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1078. The Lynx Amendment has been incorporated into eighteen national forest plans. *Id.* At the hearing, Federal Defendants indicated that the Lynx Amendment standards were incorporated into the Beaverhead-Deerlodge National Forest Plan in 2009. Without citation to any legal authority, Federal Defendants argue that this consultation satisfies any further need for forest-wide analysis.

It is true that the Ninth Circuit's recent opinion in *Alliance for the Wild Rockies v. Savage* concluded that a plaintiff's section 7 Lynx Amendment consultation claim was moot in light of the FWS's recent biological opinion measuring the effects of the Lynx Amendment on lynx and lynx critical habitat. 897 F.3d 1025, 1029, 1031 (9th Cir. 2018). However, the holding in *Savage* does not render any and all programmatic challenges concerning lynx moot. *Savage* is limited to section 7 claims within areas governed by the Lynx Amendment, namely, Lynx Analysis Units. Because there are provisions of the Forest Plan

-8-

other than the Lynx Amendment that "may affect" lynx outside of the areas protected by the Lynx Amendment, and because the FWS determined that lynx "may be present" throughout the forest, a plaintiff may still bring a section 7 consultation claim to the broader Forest Plan itself. *See Native Ecosystems Council v. Marten*, 2018 WL 3831339, at \*4 (D. Mont. Aug. 13, 2018) (stating that "the Lynx Amendment only applies to mapped lynx habitat on National Forest System land presently occupied by Canada lynx" and holding that a forest-wide determination that lynx "may be present" arguably requires consultation of an agency action that "may affect" lynx but where "compliance with the Lynx Amendment is not required.") Such is the case here.

From the beginning, Plaintiffs have raised a programmatic challenge. *Native Ecosystems Council*, 946 F. Supp. 2d at 1066. The FWS subsequently determined that lynx "may be present" across the entire forest. (Doc. 56-7 at 1.) The consultation regulations make clear that this determination rendered consultation necessary for any agency action—here, the Forest Plan—that may affect a listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Forest-wide consultation on lynx has not been done. (Doc. 63 at 28.)

Turning to the narrow question before the Court, whether Federal Defendants have fulfilled everything necessary to set aside the injunction, the

-9-

answer is no. The Fleecer Project will remain enjoined until Federal Defendants complete forest-wide consultation to determine what effects, if any, the Forest Plan may have on lynx.

## II. Grizzly Bears

On remand, this Court instructed the Forest Service to prepare a new biological assessment to determine "whether the Project 'may affect' grizzly bears." *Native Ecosystems Council*, 946 F. Supp. 2d at 1067. Both parties agree that the Court's instructions were followed, a new biological assessment was prepared, and the FWS concurred in its result. (Docs. 56 at 8–9, 63 at 31.) The Court agrees with the parties and concludes that Federal Defendants have met their burden to show compliance with the Court's remand order. No further action is necessary as it relates to grizzly bears.

## III. Roads

This Court also instructed the Forest Service to "supplement its EIS for the Forest Plan to explain or support, if possible, its decision to exclude temporary roads from the road density objectives and to correct the record to show that permitted and administrative roads are included in the objectives." *Native Ecosystems Council*, 946 F. Supp. 2d at 1067. The Court considered this clarification necessary for two reasons. First, it appeared there was a typo in Forest Plan EIS concerning what was included in the road density objectives. *Id.*

-10-

The Court noted that "[e]ach table in the Forest Plan that lays out year-round or fall road density objectives includes a footnote indicating that roads that are only open to permitted and administrative use are *not* included." *Id.* at 1087 (emphasis added). If true, this practice deviates from the best available science on the subject, which indicates that "[a]ny motorized vehicle use on roads will reduce habitat effectiveness . . . including administrative use." *Id.* However, through context, it appeared as if this footnote was a typo—meaning, the sentence should have read "administrative and permitted roads *are* included," rendering the Forest Service's treatment of road density consistent with the best available science. Accordingly, the Court instructed the Forest Service to Supplement the EIS to clarify whether administrative and permitted roads were included in road density calculations. *Id.* at 1088.

Additionally, the Court was concerned that the Forest Service's exclusion of temporary roads from road density objectives also conflicted with the best available science. *Id.* There was nothing in the Forest Plan EIS that explained why temporary roads should not be treated in the same way as all other roads, given that "[a]ny motorized vehicle use on roads will reduce habitat effectiveness." *Id.* The Court remanded the EIS to "explain or support" this decision. *Id.*

## A.  Administrative and Permitted Roads

To clarify its typo, the Forest Service issued a Forest Plan Errata. (Doc.

-11-

56-5.)   This ten-page document replaced certain pages in the original Forest Plan in order to clarify that permitted and administrative roads were, in fact, included in the original road density objectives.   (*Id.* at 1.)   Approximately a year later, the Forest Service issued its Final Supplemental Environmental Impact Statement for the Forest Plan ("FSEIS"), again clarifying that permitted and administrative roads were included in the road density objectives and explaining its decision to exclude temporary roads.   (Doc. 56-3.)

Plaintiffs now argue that the Forest Service did not comply with the Court's remand, taking objection to the form of this correction rather than its substance. Plaintiffs argue that the Forest Service was instructed to address administrative and permitted roads in a Supplemental EIS, and instead, issued the correction in the Forest Plan Errata, a non-NEPA document.   (Doc. 63 at 9–11.)   Plaintiffs urge the Court to follow its reasoning in *Friends of Wild Swan v. U.S. Forest Service*, 2013 WL 1295339 (D. Mont. 2013), and demand NEPA compliance.

In *Friends of Wild Swan*, the Court denied the Forest Service's motion to dissolve an injunction because the Court had ordered a supplemental EA and the Forest Service instead prepared a supplement to the EA.   *Id.* at *1.   By the agencies own admission, the supplement to the EA did not conform with NEPA regulations.   *Id.*   The Court determined that this failure was substantial because NEPA serves important procedural ends.   *Id.*   Allowing the Forest Service to

-12-

skirt its NEPA obligations would "render the Forest Service's own rules . . . superfluous." *Id.* The court was not persuaded by the Forest Service's attempts to argue that the "supplement to the EA" substantially complied with NEPA-like procedures because the agency allowed a public comment period. *Id.* at *2.

The Forest Service argues that *Friends of Wild Swan* should not govern this decision because an errata is the proper mechanism to make an administrative change, which includes correcting clerical errors to any part of the plan and because the agency fulfilled its obligations in the SFEIS. (Doc. 65 at 4–5 (citing to 36 C.F.R. § 219.13(c)).)

The Court agrees that *Friends of Wild Swan* is not controlling. First, unlike the substantive deficiency there (an inadequate cumulative effects analysis), the error here was typographical. The Court agrees with the Forest Service that the change made in the Errata was an "administrative change" rather than a "plan amendment" or "plan revision." *See* 36 C.F.R. § 219.13(c). Therefore, correcting the typo with an errata was not improper under NEPA. Regardless, Plaintiffs are incorrect that the Forest Service failed to comply with the Court's instruction to clarify the treatment of permitted and administrative roads in a Supplemental EIS. While the Forest Service issued this correction in the Errata first, it also clarified its treatment of administrative and permitted roads by amending the definition of open motorized road and trail density ("OMRTD")

within the SFEIS.  (Doc. 56-3 at 8, n.6.)  This alone makes *Friends of Wild Swan* inapposite.  For these reasons, the Court finds that the Forest Service complied with the Court's remand instructions and no further action is required on the issue of administrative and permitted roads.

## B.    Temporary Roads

Additionally, this Court instructed the Forest Service to "supplement its EIS for the Forest Plan to explain or support, if possible, its decision to exclude temporary roads from the road density objectives."  *Native Ecosystems Council*, 946 F. Supp. 2d at 1067.  Plaintiffs now argue that the Forest Service failed to comply with the Court's remand instructions, because instead of explaining or supporting its decision to exclude temporary roads, the SFEIS merely "discloses the effect of not including temporary roads in [road density calculations] on the eight key issues contained in the Forest Plan itself."  (Doc. 56-3 at 13.) Plaintiffs maintain that temporary roads should be included in OMRTD objectives and that the SFEIS fails to address why its decision to exclude temporary roads does not run afoul of "Christensen et. al. (1993), a study the parties agree is among the best available science on the subject of protecting elk habitat."  *Native Ecosystems Council*, 946 F. Supp. 2d at 1083.  Christensen recommends that "[a]ny motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicles and all uses, including

-14-

administrative use." *Id.* at 1087. In addition, Plaintiffs revive its argument above, taking issue with the document titled "Explanation Supporting Not Including Temporary Roads in Open Motorized Road and Trail Densities," ("Explanation Supporting"), as a "stand alone" non-NEPA document. (Doc. 63 at 14.)

Addressing the last argument first, the Court disagrees that the Explanation Supporting document demonstrates a lack of compliance with the Court's order. The Explanation Supporting document is the Reader's Digest version of the changes that the Forest Service made in its SFEIS to address the Court's concerns. While helpful, the document is not necessary: it contains no information that is not already contained within the SFEIS. Therefore, the Court will focus its attention on whether the changes in the SFEIS adequately "explain or support" the decision to exclude temporary roads.

In its remand order, the Court noted two particular deficiencies pertaining to temporary roads. First, the Court observed that the Forest Service's insistence that temporary roads should not be included in OMRTD was not supported by Christensen. *Id.* at 1088. It also observed that the definitions section did not support the exclusion of temporary roads because it drew no meaningful distinction between temporary roads as compared to administrative and permitted roads. *Id.*

Accordingly, the Forest Service created a new definition of road density that

-15-

adequately distinguished a temporary road from an administrative or permitted road.[1]  The definition explains that temporary roads are obliterated at project completion, whereas administrative and permitted roads are not.

Additionally, the SFEIS reconciles its treatment of temporary roads with the best available science.  Christensen recognizes that any motorized vehicle use reduces habitat effectiveness.  *Id.*  The general purpose of a road density objective is to "address the issue of habitat security, connectivity and linkage." (Doc. 56-3 at 29.)  The goals developed in the OMRTD "address the long term desired condition of secure areas" across the entire forest.  (*Id.*)  However, the SFEIS recognizes that OMRTD does not convey a complete figure of habitat security, because "[p]otential, short-term wildlife displacement from the use and construction of [a] . . . temporary road is influenced by a number of factors."  (*Id.*) For example, even a temporary road that is completely obliterated upon project completion, may still "displace wildlife from secure areas when located in, or near, a secure area" depending on the site-specific terrain and other relevant features. (*Id.* at 28.)  Therefore, the Forest Service's decision to exclude temporary roads

---

[1] The new definition reads:

**OMRTD** is a measurement of motorized routes open to use, measured at the completion of project implementation in miles per square mile.  It consists of motorized roads and trails that fall within the external forest boundary and are (1) open to public motorized use, (2) open for permitted and/or administrative use and remain on the landscape, (3) temporary unless obliterated at project completion, and (4) motorized routes on private inholdings.

from OMRTD recognizes that the effects of temporary roads are best determined at the site-specific, rather than programmatic level. (*Id.*) Further, because the intent of programmatic management is based on addressing long-term goals and because temporary roads are "obliterated at project completion," the decision to exclude OMRTD aligns with the Forest Service's purpose for measuring OMRTD and its decision to calculate OMRTD at project completion.

Having reviewed the Forest Service's treatment of temporary roads in relation to the best available science as explained and supported by the SFEIS, the Court concludes that the Forest Service has fully complied with the Court's instruction on this matter.

## IV. Elk

This Court also instructed the Forest Service to "supplement [the EA] with a full and fair discussion of the impact that temporary roads will have on elk during the Project's lifetime." *Native Ecosystems Council*, 946 F. Supp. 2d at 1067. This was important because road density levels were already above OMRTD in the Project area and elk populations were below state objectives in the two hunting units that bisect the Project. *Id.* Without analysis of the effects that temporary roads might have on elk security—and by extension—elk population, this Court determined that the Project EA "entirely failed to consider an important aspect of the problem." *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.

2008) *overruled by Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 129 (2008)).

The Forest Service now argues that it has complied with the Court's order because its recently-completed 444-page supplemental EA corrects the deficiencies noted by addressing the five factors which bear on whether a temporary road is likely to cause short-term displacement to wildlife ("wildlife displacement factors"), including: (1) the length of the road; (2) proximity of the road to a secure area; (3) time of year the road is being used; (4) length of time the road is used; (5) vegetation and terrain. (Docs. 56 at 7; 56-1 at 91.)

Plaintiffs observe that the actual discussion of temporary roads is quite limited. (*See* Doc. 63 at 15–27.) Of the twenty-two pages in the SEA that the Forest Service indicates contains the required discussion, Plaintiffs accurately demonstrate that little more than two paragraphs actually contain analysis of the temporary roads proposed by the Project in light of the five factors that pertain to wildlife displacement.[2] (*See* Docs. 63 at 15–27; 63-1 at 22; 63-2.)

Plaintiffs' argument has merit. Though, as a whole, the SEA examines the

---

[2] Only one of these two paragraphs is actually directed to the discussion of temporary roads. (*See* Doc. 63-1 at 22.) The paragraph detailing the possible effects of the temporary road segment accessing Unit 60 will not be considered because it is not a temporary road. The explanation explains that this road segment is a level 1 road, meaning that it is closed yearlong to wheeled motorized use, but contains no indication that it will be obliterated at project completion.

-18-

impact of temporary roads in greater detail, the specific discussion of the impact that temporary roads will have on elk, particularly in light of the "already-high road density, combined with the increase in temporary roads and temporary decrease in summer secure habitat . . . during the Project's five to ten year lifetime" is extremely thin.   (*Compare* Docs. 63-1 and 63-2.)   As Plaintiffs note, of the 5.88 miles of temporary road disclosed by the SEA—which seems to include at least 12 new road segments—only one of these temporary roads is discussed in particular detail.   (*See* Doc. 63-1 at 4–5, 6, 22.)   While the SEA provides considerable detail regarding the 4.37 miles of temporary road built to access lodgepole pine salvage harvest units, including road length, pertinent restrictions, and rationale (*see* Table 9, Doc. 63-1 at 4), the SEA provides no comparable information for the 1.51 miles of temporary road built to access Douglas-fir commercial thin units.   Nor does the SEA acknowledge or explain why no comparable table exists.

Moreover, given the Court's instruction on remand to provide a "full and fair discussion of the impact that temporary roads will have on elk during the Project's lifetime," and, in light of the Forest Service's disclosure of the five wildlife displacement factors, one might expect to see a table or narrative description that addresses each of these five factors as they pertain to each of the twelve or more road segments.   No such table or narrative analysis exists.   It is difficult to

-19-

square the absence of such disclosure with the Court's instruction to include a "full and fair" discussion.

And yet, the Court is mindful that an EA does not require the same level of detail as an EIS. As compared to an EIS, an

> EA is a more concise document whose purpose is to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . . an EA must contain a discussion of the need for the proposed action, potential alternatives to the project, a discussion of the environmental impacts of the project and the alternatives . . . demonstrate that the agency took the required "hard look" at the environmental consequences of the project before concluding that those impacts were insignificant.

*Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 990–91

(E.D. Cal. 2005) (internal quotation marks, alterations, and citations omitted).

In addition to the discussion of the temporary road accessing Unit 37, the SEA's broader discussion of temporary roads clarified a few things that were not contained in the original EA. For starters, at the time of its remand order, the Court did not know whether the Forest Service's decision to exclude temporary roads from OMRTD deviated from the best available science. *Native Ecosystems Council*, 946 F. Supp. 2d at 1088. The Forest Service has now clarified the Forest Plan to explain that this decision is consistent with Christensen because temporary roads will addressed at the site-specific level. (Doc. 56-3 at 28–29.) Although arguably captured within the meaning of "temporary," the original EA did not

explain the timeline on which temporary roads would be obliterated. *See Native Ecosystems Council*, 946 F. Supp. 2d at 1088. The SEA explains that temporary roads will be obliterated immediately after use and that most temporary roads will remain active for only a single year. (Doc. 56-1 at 21.) The original EA failed to explain that temporary roads will not be open simultaneously. (*Id.* at 91.) Nor did the original EA make clear the significance of the fact that most, if not all, temporary roads will be closed during fall hunting season when elk are most vulnerable. (*Id.* at 94.)

This new information addresses a number of the wildlife displacement factors as they apply to all temporary roads within the Project. Factors three and four are addressed because the SEA explains that most, if not all, temporary roads will be closed during fall hunting season and that most roads will be in use for only a short duration. Additionally, Table 9 adequately addresses the first factor because it indicates the length of each road segment within the lodgepole harvest units are relatively short, ranging from .06 to 1.08 miles. (*See* Doc. 63-1 at 4.)

Additionally, the SEA explains that the fifth wildlife displacement factor is far less relevant to elk because numerous studies have found that OMRTD has the greatest consideration on habitat effectiveness and that vegetation variables have virtually no significance on elk mortality. (Doc. 63-1 at 14–15.) This leaves only the second wildlife displacement factor left to discuss, proximity of the road

-21-

to secure habitat.

The SEA explores the proximity of temporary roads to elk secure habitat in three places. Figure 16 demonstrates that summer wildlife secure areas make up 30% of the Project area. (Doc. 63-1 at 8, 10.) Figure 17 demonstrates that fall elk secure areas make up 61% of the Project area. (Id. at 11–12.) The difference between these figures reflects the fact that many of these roads are subject to use restrictions during fall hunting season. These figures, together with the Fleecer Mountains Project Alternative 3 East map, provide a good indication of where temporary roads occur in relation to secure areas. (*See* Doc. 56-1 at 372.) Additionally, the SEA explains that there are only two commercial units planned for summer harvest that intersect a summer secure area. (Doc.63-1 at 22.) Of these two units, only Unit 37 is relevant here because it is the only commercial unit falling in summer secure area that is accessed by a temporary road. (*Id.*) Of the 1.08 miles of temporary road constructed to access Unit 37, the SEA explains that only .11 miles actually fall within a secure area. (*Id.*) This will displace only 700 acres of secure habitat. (*Id.*) Additionally, "[t]here is a large ridge separating Unit 37 from the rest of the secure block, giving the elk geographic barrier as well as distance." (*Id.*) This adequately addresses factors two and five.

Taken in its full context, the SEA sufficiently demonstrates that the impact

of temporary roads on elk during the Project's lifetime will be extremely limited. Of the five wildlife displacement factors, only the second factor, proximity to a secure area, is even at issue.    Because this road segment is small and displaces a relatively small amount of secure area and because there are other particular geographic features mitigating its impact, the SEA fairly concludes that elk are not likely to feel the impact of this disruption.    Though it is a close call, the Court concludes that the information contained in the SEA as a whole provides a full and fair discussion of the impact that temporary roads will have on elk during the Project's lifetime.    No further action is required on the impact of temporary roads on elk.

In sum, the Court concludes that Federal Defendants have fully complied with three of the Court's instructions on remand.    Because Federal Defendants have not discharged their section 7 consultation requirements, the Court will not dissolve the injunction at this time.

Accordingly, IT IS ORDERED that Federal Defendant's Motion to Dissolve Injunction (Doc. 55) is DENIED.

DATED this 15th day of October, 2018.

Dana L. Christensen, Chief Judge
United States District Court

-23-